# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

BLUE BYRD, LLC, d/b/a LENDAPI,

                Plaintiff,

      v.

ML ENTERPRISE INC., d/b/a ENGINE BY MONEYLION,

                Defendant.

Index No. _____

**VERIFIED COMPLAINT**

---

Plaintiff Blue Byrd, LLC, *d/b/a* LendAPI ("LendAPI"), by and through its undersigned counsel, Pillsbury Winthrop Shaw Pittman LLP, as and for its Complaint against Defendant ML Enterprise Inc., *d/b/a* Engine by MoneyLion ("MoneyLion"), alleges as follows:

## SUMMARY OF THE ACTION

1. This is an action for a declaratory judgment, pursuant to New York Civil Practice Law and Rules ("CPLR") § 3001, declaring that a commercial non-compete restrictive covenant that contains *no geographic or temporal limitations* (the "Non-Compete") is unenforceable as a matter of law. LendAPI further seeks a preliminary injunction restraining MoneyLion from seeking to enforce or threatening to enforce the Non-Compete, pending final adjudication of this matter.

2. Plaintiff LendAPI is a financial technology company that provides an innovative platform and infrastructure enabling lenders to automate and optimize the loan application and loan underwriting process. LendAPI's technology allows banks, credit unions, and other financial institutions and businesses to connect seamlessly with third-party data sources, verify applicant information in real time, and deliver faster, more accurate credit decisions. LendAPI's technology streamlines the lending workflow, reduces fraud and compliance risks, and enhances the customer

4905-6370-2905

experience for borrowers seeking credit.

3. On July 1, 2024, LendAPI and MoneyLion entered into a Software-as-a-Service License and Consulting Agreement (the "SaaS Agreement"), pursuant to which LendAPI agreed to help MoneyLion build, develop and launch a decision model technology to be implemented into MoneyLion's "Engine by MoneyLion" software platform. The SaaS Agreement is attached hereto as **Exhibit A**.

4. Section 5 of the SaaS Agreement contains a non-compete clause that purports to prohibit LendAPI from making LendAPI's technology available, "**in perpetuity,**" to any "marketplace provider or aggregator of financial product and services" – *i.e.*, virtually any participant in the fintech industry, including banks, financial platforms, technology providers, and other intermediaries that facilitate access to financial products or services – **anywhere in the world** (the "Non-Compete").

5. New York courts have long disfavored such commercial non-competes, enforcing them only to the extent they are (1) reasonable in time, (2) reasonable in geography, and (3) necessary to protect legitimate business interests. Accordingly, it is well-established that a non-compete like this one, that is unlimited in time and in geographic scope, is *per se* unreasonable and unenforceable.

6. The Non-Compete here also serves no legitimate MoneyLion business interest protectable under New York law. It is instead a naked prohibition on competition wholly unnecessary to protect any MoneyLion proprietary information at all. The Non-Compete constitutes an unlawful restraint of trade that operates solely to tie LendAPI's hands and insulate MoneyLion from ordinary market competition, effectively giving MoneyLion a monopoly over LendAPI's entire suite of offerings. New York law does not permit the use of commercial non-

competes for that illicit purpose.

7. LendAPI has provided MoneyLion the applicable legal authorities demonstrating that the Non-Compete is void and unenforceable as a matter of law. MoneyLion has nonetheless refused to disclaim its demand that LendAPI comply with the Non-Compete in its entirety, and has instead threatened to initiate legal action to enforce it.

8. As a result of MoneyLion's threats and refusal to abandon its legally untenable position, a real and immediate justiciable controversy exists between LendAPI and MoneyLion concerning their respective rights and obligations under the Non-Compete.

9. LendAPI therefore brings this action to secure a judicial declaration that the Non-Compete is void and unenforceable – a declaration that will resolve the parties' dispute, remove the cloud of uncertainty that MoneyLion's threats have created, and allow LendAPI to compete in the marketplace.

10. Until and unless the Court declares the Non-Compete unenforceable, LendAPI will suffer irreparable harm to its business relationships, goodwill, and reputation, as the existence of the Non-Compete severely chills potential partnerships and prevents LendAPI from obtaining new customers. LendAPI therefore also seeks a preliminary injunction restraining MoneyLion from seeking to enforce or threatening to enforce the Non-Compete pending final adjudication of this matter.

**PARTIES, JURISDICTION AND VENUE**

11. Plaintiff LendAPI is a limited liability company organized and existing under the laws of the State of California. LendAPI's principal place of business is located at 8502 East Chapman Avenue, Suite 332, Orange, California 92869.

12. Defendant MoneyLion is a corporation organized and existing under the laws of the State of Delaware. Upon information and belief, MoneyLion's principal place of business is

located at 30 West 21st Street, Floor 10, New York, NY 10010.

13. Jurisdiction is proper in this Court pursuant to CPLR §§ 301 and 302 because MoneyLion transacts substantial business in the State of New York and has availed itself of jurisdiction in New York. Separately, under the SaaS Agreement, MoneyLion expressly consented to New York County, New York as the exclusive jurisdiction and venue for any dispute arising out of the SaaS Agreement. *See* Ex. A § 20.

14. Venue in New York County is also proper pursuant to CPLR §§ 503(a) and (c) because it is the location of MoneyLion's principal place of business.

15. Jurisdiction is appropriate in the Commercial Division of the Supreme Court of the State of New York, County of New York, pursuant to the Rules of the Commercial Division of the Supreme Court, as set forth in Section 202.70 of the Uniform Rules for the New York State Trial Courts.

**FACTUAL ALLEGATIONS**

A.  *LendAPI's Business and the SaaS Agreement*

16. Founded in March 2024, LendAPI has taken the fintech industry by storm. By leveraging advanced analytics and artificial intelligence, LendAPI is revolutionizing the fintech infrastructure sector and empowering financial institutions to make faster, smarter, and more transparent credit decisions. LendAPI's rapid growth underscores its critical role in reshaping how lending technology is delivered and deployed across the marketplace.

17. Over the past year, demand for LendAPI's services has accelerated dramatically, driven in part by the financial industry's growing interest in and reliance on artificial intelligence and data-driven automation tools. As lenders seek to modernize their underwriting and compliance operations, LendAPI's technology has become essential infrastructure – offering a secure, scalable, and intelligent platform that integrates seamlessly with existing systems.

18. One such customer that currently utilizes LendAPI's platform is MoneyLion, a New York City-based financial technology company founded in 2013 that provides financial products and services such as banking, borrowing, investing and credit-building through its mobile app platform "Engine by MoneyLion."

19. On July 1, 2024, LendAPI, as Provider, and MoneyLion, as Customer, entered into the SaaS Agreement.

20. Pursuant to the SaaS Agreement, LendAPI agreed to help MoneyLion develop and service a decision model technology (the "Technology") to be implemented into MoneyLion's "Engine by MoneyLion" software platform. Using LendAPI's Technology, the Engine by MoneyLion platform employs a data-driven approach to leveraging advanced analytics, artificial intelligence, and machine learning to provide personalized financial product recommendations and automated credit decisions for its partners and customers rapidly, and at scale.

21. More specifically, the Technology aggregates a wide range of data, including applicant-provided information (such as income, assets and debt) and third-party data from credit bureaus. Then, utilizing advanced statistical models and artificial intelligence, the Technology analyzes the data to identify trends, anomalies and potential red flags (such as fraud or bankruptcies).

22. The Technology then performs compliance checks and quantitatively scores applicants based on its analysis, evaluating consumers' likelihood of repaying debt. Using that assessment, the Technology then delivers a decision for the consumer — approval, denial or a counteroffer of the financial product or service requested.

23. The Technology continuously uses data insights and reporting to monitor outcomes, track consumer behavior, and refine its strategies and rules in real-time, allowing for

5

continuous improvement of its models and offerings.

24. In simple terms, by using the Technology, Engine by MoneyLion replaces or enhances manual review processes with a consistent, data-backed, and highly automated system, enabling seamless and efficient delivery of financial services.

25. Under the SaaS Agreement, in connection with developing, iterating and servicing the Technology, LendAPI agreed to perform three different services for MoneyLion:

(a) SaaS Services, defined as "the software-as-a-service offering (including any features, updates, enhancements and modifications thereto provided by [LendAPI]) which will enable [MoneyLion] to onboard, operate, host, store, run and apply one or more of the Hosted Models of [MoneyLion]'s Marketplace Partners to Consumer Data in order to generate pre-qualified and/or otherwise matched Offers" (*see* Ex. A § 1(i));

(b) Consulting Services, defined as "assisting [MoneyLion] in developing software and systems to use in connection with the SaaS Services and any other services that are mutually agreed upon by the Parties" (*see id*. § 4(a)); and

(c) Support Services, defined as "technical support services and all requested maintenance for the SaaS Services" (*see id*. § 2(b); *id.* Ex. B).

26. In connection with providing the SaaS Services, Consulting Services and Support Services, the SaaS Agreement contemplated that LendAPI would use and potentially disclose to MoneyLion "Provider IP," which was defined as the three Services provided by LendAPI themselves; LendAPI's "trade names, domain names, trademarks, service marks, logos, and other distinctive brand features"; and "any and all intellectual property of [LendAPI] provided to [MoneyLion], including all copyrights, trademarks, patents, trade secrets, and other intellectual property rights, whether or not registered or registrable." *See id*. § 1(g)-(h).

27. Importantly, the SaaS Agreement expressly states that, "[f]or the avoidance of doubt, Provider IP does not include [MoneyLion's own] IP or Consumer Data." *Id*. § 1(h).

### B. The Non-Compete in the SaaS Agreement

28. Section 5 of the SaaS Agreement contains the Non-Compete, which provides that, beginning on July 1, 2024, and continuing "in perpetuity" unless terminated by MoneyLion (*see id*. § 18), LendAPI shall not, directly or indirectly:

> [L]icense or otherwise sell, distribute, provide or otherwise make available the Services or any other Provider IP to or for the benefit of . . . (b) any other marketplace provider or aggregator of financial product and services [Competitors] . . . In connection therewith, [LendAPI] shall not solicit, negotiate, accept, encourage, consider or otherwise pursue any offer or inquiry from any Competitor regarding a transaction between such Competitor and [LendAPI] for the Services or otherwise of the type contemplated by this Agreement, and [LendAPI] shall immediately terminate all discussions with any Competitor regarding such transaction.

Ex. A § 5.

29. In short, the Non-Compete purports to bar LendAPI in perpetuity from making available any SaaS Services, Consulting Services or Support Services, as well as any Provider IP, to "any other marketplace provider or aggregator of financial product and services" – *i.e.*, virtually any participant in the fintech industry, including banks, financial platforms, technology providers, and other intermediaries that facilitate access to financial products or services – anywhere in the world and for all time.

30. The Non-Compete therefore prevents LendAPI from conducting business with nearly the entire industry sector in which LendAPI and MoneyLion operate, giving MoneyLion a *de facto* monopoly over LendAPI's entire suite of offerings.

31. The Non-Compete does nothing to protect any confidential information [1] or

---

[1] MoneyLion's confidential information is also subject to extensive protections under Section 10 of the SaaS Agreement, titled "Confidential Information." *See* Ex. A § 10.

intellectual property belonging to MoneyLion, as the Non-Compete only covers the Services provided by LendAPI, and Provider IP, which is *LendAPI'*s IP.

32. In fact, Provider IP, as defined in the SaaS Agreement, expressly excludes Customer IP, *i.e.,* MoneyLion's own IP, or Consumer Data.

33. Customer IP is defined in the SaaS Agreement as:

> [T]he Engine Platform [i.e., Engine by MoneyLion], (ii) Customer's Marks [defined as MoneyLion's "trade names, domain names, trademarks, service marks, logos, and other distinctive brand features"], (iii) the Hosted Models, (iv) any software, technology, applications, features, interfaces, functionality and capabilities (as well as any and all updates, enhancements, improvements or modifications thereto) created by Customer in connection with its access, use and operation of the Services, (v) any data relating to any of the foregoing, including data based on or derived from any such data, (vi) any and all intellectual property rights associated with any of the foregoing, including all copyrights, trademarks, patents, trade secrets, and other intellectual property rights, whether or not registered or registrable, including all derivative works of, based on, derived from, or otherwise using any of the foregoing, including all output, copies, reproductions, improvements, modifications, adaptations and translations, and (vii) all information, data, and content, in any form or medium, that is submitted, posted, or otherwise transmitted by or on behalf of Customer through the Services.

Ex. A § 1(d), (g).

34. Consumer Data, in turn, is defined as the information that MoneyLion collects from its consumers who use the Engine by MoneyLion platform. *See id.* § 1(c).

### C. *LendAPI Notifies MoneyLion that the Non-Compete is Unenforceable; MoneyLion Nonetheless Threatens to Enforce the Non-Compete*

35. On October 20, 2025, counsel for LendAPI sent a letter to MoneyLion's counsel, explaining, with extensive citations to New York law, why the Non-Compete was unenforceable as a matter of New York law. *See* **Exhibit B**.

36. On November 3, 2025, counsel for MoneyLion responded to LendAPI's letter, denying that the Non-Compete was unenforceable, and threatening that, if LendAPI did not adhere to it, MoneyLion would "seek injunctive relief, damages for willful breach, attorneys' fees, and

any other available relief." See **Exhibit C** at 2.

37. On November 17, 2025, LendAPI responded to MoneyLion's November 3 Letter, with additional authority supporting its position that the Non-Compete was unenforceable. *See* **Exhibit D**. LendAPI also attached a draft Complaint for declaratory relief, which LendAPI stated it would file in fourteen days, unless MoneyLion conceded the Non-Compete was unenforceable.

38. There has been no such concession from MoneyLion.

### D. *The Non-Compete Continues to Cause Irreparable Harm*

39. By purporting to restrict LendAPI's ability to engage with any other participant in the fintech industry, the Non-Compete is casting a cloud of uncertainty over LendAPI's business operations and has materially impaired LendAPI's ability to expand its network, form new business relationships, and capture opportunities in an intensely competitive and fast-evolving market.

40. The harm is especially acute because the financial industry is undergoing a rapid digital transformation, fueled by growing reliance on artificial intelligence, machine learning, and data-driven automation tools. LendAPI's cutting-edge platform sits at the center of this shift.

41. At a time when the market is expanding at an unprecedented pace, MoneyLion's assertion of an unlawful non-compete threatens to freeze LendAPI out of key relationships, stifle innovation, and deprive it of business opportunities that cannot be recovered once lost.

42. Moreover, MoneyLion's threat to enforce the Non-Compete "in perpetuity" without any additional monetary compensation to LendAPI beyond that provided in the SaaS Agreement, threatens LendAPI's continued viability.

43. The harm caused by the Non-Compete cannot be adequately remedied through monetary damages. Business opportunities foregone, goodwill lost, and reputational damage

sustained in a dynamic technology sector are not readily identifiable or quantifiable.

44. Each day that MoneyLion maintains its threats to enforce the Non-Compete, LendAPI faces continued interference with its right to compete in the marketplace.

## FIRST CAUSE OF ACTION
### CPLR § 3001 - Declaratory Judgment

45. LendAPI repeats and realleges paragraphs 1 through 44 as if fully set forth herein.

46. An actual, present and justiciable controversy exists between LendAPI and MoneyLion regarding the validity and enforceability of the Non-Compete, and enforcement of the Non-Compete strangles LendAPI's ability to grow its business operations.

47. Under well-established New York law, commercial non-compete restrictions are enforceable only if they are reasonable in time and geographic scope, and are no broader than necessary to protect a legitimate business interest.

48. The Non-Compete here fails each of these requirements because it (i) contains no geographic limitations, (ii) contains no temporal limitations, and (iii) does not protect any legitimate MoneyLion business interest.

49. LendAPI is entitled to a declaratory judgement that the Non-Compete is void and unenforceable as a matter of law.

50. The Non-Compete is also incapable of being "blue-penciled" because it is overbroad in every respect and therefore cannot be enforced, even in part, without the Court having to rewrite the provision in its entirety.

51. The declaratory judgment sought here would resolve the parties' bona fide dispute and clarify their respective legal rights and obligations under the SaaS Agreement.

52. Declaratory relief is also necessary to resolve uncertainty and prevent harm because other remedies would not fully clarify the parties' rights.

53. MoneyLion's actions in threatening to enforce the Non-Compete have caused, and will continue to cause, irreparable harm to LendAPI's prospective business relationships, goodwill, and reputation, as the existence of the Non-Compete chills potential partnerships and freezes LendAPI's business operations.

54. LendAPI is likely to succeed on the merits because the Non-Compete is facially overbroad and unenforceable under New York law.

55. The balance of equities tips decidedly in LendAPI's favor, as MoneyLion will suffer no harm from being prevented from enforcing an unlawful restraint on trade, while LendAPI faces severe economic and reputational injury absent declaratory and injunctive relief.

56. The public interest favors granting the requested injunction because New York public policy strongly disfavors unreasonable restraints on trade and promotes open competition.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff LendAPI respectfully requests that the Court:

A. Enter preliminary injunctive relief, restraining Defendant MoneyLion from seeking to enforce or threatening to enforce the Non-Compete pending final adjudication of this matter;

B. Declare that the Non-Compete is void and unenforceable as a matter of New York law;

C. Award Plaintiff LendAPI its costs and reasonable attorneys' fees as permitted by law; and

D. Grant such other and further relief as the Court deems just and proper.

Dated:   New York, New York
         December 10, 2025                    Respectfully submitted,

                                              **PILLSBURY WINTHROP SHAW PITTMAN LLP**

By: /s/ *Kenneth W. Taber*
Kenneth W. Taber
Brian L. Beckerman
31 West 52nd Street
New York, NY 10019-6131
Phone: 212.858.1000
Fax: 212.858.1500
kenneth.taber@pillsburylaw.com
brian.beckerman@pillsburylaw.com

*Attorneys for Plaintiff Blue Byrd, LLC d/b/a LendAPI*

## **VERIFICATION**

TIMOTHY LI, being duly sworn, avers as follows:

I am the Co-Founder and Chief Executive Officer of Plaintiff Blue Byrd, LLC *d/b/a* LendAPI in this proceeding. I have reviewed the foregoing Complaint and know its contents, which are true to my own knowledge gained by virtue of my position as Co-Founder and Chief Executive Officer, except as to matters therein stated on information and belief, and as to those matters, I believe them to be true.

_____
Timothy Li

Sworn to before me on this

10ᵗʰ day of December 2025

_____
Notary Public

[Notary stamp: VY THUY LI, Notary Public - California, Orange County, Commission # 2512049, My Comm. Expires Mar 10, 2029]

Please see attached →

# JURAT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of __Orange__

Subscribed and sworn to (or affirmed) before me on this __10th__ day of __December__,

20__25__ by __Timothy Li__,

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

_____
(Signature)                    (Seal)



VY THUY LI
Notary Public - California
Orange County
Commission # 2512049
My Comm. Expires Mar 10, 2029

---

## OPTIONAL INFORMATION

**DESCRIPTION OF THE ATTACHED DOCUMENT**

__Blue Byrd LLC vs Money Lion__
(Title or description of attached document)

__Supreme Court New York__
(Title or description of attached document continued)

Number of Pages __13__   Document Date __12/13/2025__

_____
Additional information

## INSTRUCTIONS

The wording of all Jurats completed in California after January 1, 2015 must be in the form as set forth within this Jurat. There are no exceptions. If a Jurat to be completed does not follow this form, the notary must correct the verbiage by using a jurat stamp containing the correct wording or attaching a separate jurat form such as this one with does contain the proper wording. In addition, the notary must require an oath or affirmation from the document signer regarding the truthfulness of the contents of the document. The document must be signed AFTER the oath or affirmation. If the document was previously signed, it must be re-signed in front of the notary public during the jurat process.

- State and county information must be the state and county where the document signer(s) personally appeared before the notary public.
- Date of notarization must be the date the signer(s) personally appeared which must also be the same date the jurat process is completed.
- Print the name(s) of the document signer(s) who personally appear at the time of notarization.
- Signature of the notary public must match the signature on file with the office of the county clerk.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different jurat form.
    ❖ Additional information Is not required but could help to ensure this jurat is not misused or attached to a different document.
    ❖ Indicate title or type of attached document, number of pages and date.
- Securely attach this document to the signed document with a staple.

2015 Version www.NotaryClasses.com 800-873-9865